UNITED STATES of America, Plaintiff,

v.

LOCAL 6A, CEMENT AND CONCRETE WORKERS, LABORERS INTERNATIONAL UNION OF NORTH AMERICA, et al., Defendants.

Thomas MADERA, Defendant/Appellant,

v.

UNITED STATES of America, Plaintiff/Appellee.

DISTRICT COUNCIL OF the CEMENT AND CONCRETE WORKERS UNION, Laborers International Union of North America and Officers of the District Council, Defendants/Appellants,

v.

UNITED STATES of America, Plaintiff/Appellee.

No. 86 Civ. 4819 (VLB).

United States District Court, S.D. New York.

Sept. 13, 1993.

Elkan Abramowitz, Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, for defendant/appellant Thomas Madera.

Victor J. Rocco, Gordon Altman Butowsky Weitzen Shalov & Wein, New York City, for defendants/appellants Dist. Council and Officers of the Dist. Council.

Peter C. Sprung, Asst. U.S. Atty., S.D.N.Y., for plaintiff/appellee.

## OPINION

VINCENT L. BRODERICK, District Judge.

### I

This case was brought by the United States, alleging violations of the Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1964, involving Local 6A of the Cement and Concrete Workers, Laborers International Union of North America ("Local 6A"), the District Council of the Cement and Concrete Workers (the "District Council"),[1] the officers of those unions, including Thomas Madera ("Madera"), and the Colombo Organized Crime Family and various of its members. On March 18, 1987, I approved a Judgment (On Consent) Against Union Defendants ("the Consent Judgment") under which sixteen of the twenty-five union officer defendants resigned and were enjoined from participating in the affairs of the union for varying lengths of time.

The Consent Judgment provided, among other things, for the appointment of a trustee to oversee the operation of Local 6A and the District Council (the "Trustee"). Madera was one of the union officer defendants who were permitted to remain as such subject to the Trustee's disciplinary authority. The Trustee was empowered to remove officers or employees of Local 6A or the District

Council under certain circumstances, including malfeasance on their part.

On December 31, 1992 the Trustee rendered a decision[2] removing Madera, a signatory of the Consent Judgment, from his position as president of the District Council and from his position on the Board of Trustees of the District Council Fringe Benefit Funds, effective immediately, based on misconduct by Madera occurring after the entry of the Consent Judgment. The Trustee recommended that "[i]f there is no change of circumstances" during a six-month period of removal, Madera upon application to this court be reinstated. Decision of the Trustee In the Matter of Thomas Madera, December 31, 1992 (the "Trustee's Dec."), at 1.

Madera filed this appeal[3] from the Trustee's decision and seeks to stay implementation of the Trustee's decision pending resolution of the appeal. Madera obtained interim relief staying his removal pending my determination of this application.[4]

I find that under the Consent Judgment Madera may pursue this appeal, but by separate order vacate a current interim stay and deny any further stay of his removal under the Trustee's decision. I deny the appeal on the merits but delay entry of judgment to that effect for forty-five (45) days.[5]

### II

This case arises in the context of governmental and public concern about harm caused to employees represented by trade unions, and to the public, by racketeer con-

---

1. The District Council of the Cement and Concrete Workers, Laborers International Union of North America.

2. Although the typed portion of the decision is preceded by a date of December 29, 1992, the Trustee's signature is dated December 31, 1992.

3. The District Council and the Officers of the District Council have also filed their own timely notice of appeal, see Dkt. # 245, Jan. 29, 1993, which would suffice even were I to find that Madera was precluded from obtaining review independently. This opinion applies to the appeals of both Madera and the District Council and its officers. The standing of the District Council and its officers to appeal the Trustee's decision is authorized by Paragraph 8(a) of the Consent Judgment and is not in dispute.

4. An emergency stay pending further order was granted by United States District Judge Charles Haight on January 21, 1993.

5. The trusteeship of Eugene R. Anderson over Local 6A and the District Council, originally to have terminated after certification of the 1990 elections of District Council delegates and officers, was extended by my orders of February 12, 1991 and February 6, 1992 to allow the Trustee to conclude various matters including his investigation of Madera. My order dated May 19, 1992 granted the Trustee's motion to terminate his trusteeship subject to the rendering of his decision with respect to Madera. His decision now having been issued, I accordingly relieve him of such duties.

trol of some labor organizations. This concern is expressed in the broader RICO statute, 18 U.S.C. § 1961 *et seq.*, specifically invoked by the United States here, and the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 401 *et seq.*, authorizing trusteeships of local unions where necessary to protect members' rights and to eradicate racketeering. See Levitan, "The Federal Law of Union Trusteeship," in *Symposium on the Labor Management Reporting and Disclosure Act of 1959* at 443 (R. Slovenko ed. 1961).

■ Such intervention under either statute may be essential where a significant pattern of racketeering is found which threatens or stymies self-government in the labor movement.

For intervention under RICO or the LMRDA to be effective, prompt action to root out corrupt behavior is essential. Such action should not be deferred merely because litigation for the purpose of blocking it is initiated. At the same time, access to review by an Article III court not directly involved in administration of the process is important and is called for by the necessity to avoid serious constitutional issues. Availability of review by a tribunal independent of short-term pressures is crucial to avoid the medicine, becoming in some instances at least, almost as dangerous as the disease.[6]

Similarly, in keeping with the Bill of Rights contained in the LMRDA, 29 U.S.C. §§ 411–415, it is critical that union members retain the right to vote for candidates of their choice for union office, and that the right to run for office be preserved so that the members can exercise their choice. This membership function of expression of an initial choice involves First Amendment interests which may be asserted even if the officers involved may then or later be prosecuted or removed from office.

By analogy, I note that the federal government does not interfere with the right of corrupt local officials to run in state or local elections (an interference which would per-

haps disrupt the republican form of government guaranteed by Article IV § 4 of the Constitution), but rather prosecutes violators of federal law notwithstanding any local office they may hold. Hence prompt, effective, judicially reviewable suspension or dismissal, but not disqualification from running for office, are in accord with the underlying objectives of RICO and the LMRDA.

These considerations form a background against which I approach the more specific questions posed here.

### III

In removing Madera, the court-appointed Trustee exercised power granted by Paragraph 8(a) of the Consent Judgment ("Paragraph 8(a)"), which authorizes the Trustee to:

remove from his or her position any officer, supervisor, agent, representative or employee of Local 6A or the District Council (including but not limited to the ... President ... and District Council designees on the Board of Trustees of any affiliated Fund).

The Trustee grounded the decision with respect to Madera on two provisions of the Consent Judgment which set forth grounds for removal: first, "whenever the Trustee reasonably believes that the person or firm (i) has engaged in conduct which constitutes or furthers an act of racketeering or malfeasance," and second, "whenever the Trustee reasonably believes that the person or firm ... (iii) has violated any of the terms of [the Consent] Judgment." Consent Judgment, Paragraph 8(a).

Because the term was not defined in the Consent Judgment, the Trustee relied on the relevant portion of the definition of "malfeasance" in *Black's Law Dictionary:*

Evil doing; ill conduct. The commission of some act which is positively unlawful; the doing of an act which is wholly wrongful and unlawful; the doing of an act which person ought not to do at all or the unjust performance of some act which the party had no right or which he had contracted

---

6. The Consent Judgment in this case provided for review by this court of determinations made by the Trustee, as discussed in part III below.

not to do. *Comprehensive term including any wrongful conduct that affects, interrupts or interferes with the performance of official duties.*

(6th ed. 1990) (emphasis added in Trustee's Dec., at 2).

Based on a record of improprieties provided by an investigation undertaken by the United States, and on depositions he took of Madera and the District Council Secretary–Treasurer, the Trustee found three instances constituting malfeasance. In summary, as more fully explained in part V below, he found that the following acts of malfeasance were committed by Madera:

(1) conduct after Madera learned about the embezzlement by a District Council clerical employee of union initiation fees, violating both the Consent Judgment and 29 U.S.C. § 501;

(2) acts prohibited by the Employment Retirement Income Security Program ("ERISA"), 29 U.S.C. § 1002 *et seq.,* and the LMRDA provision dealing with the fiduciary responsibility of officers of labor organizations, 29 U.S.C. § 501(a), in connection with Madera's participation as a member of the Board of Trustees of the Fringe Benefit Funds in investment recommendations resulting in the earning of substantial commissions by Madera's son; and

(3) direction by Madera to invest union Dues Escrow Account monies so that Madera's son earned substantial commissions, violating 29 U.S.C. § 501(a) and the District Council Constitution.

After issuing his decision, the Trustee determined that the provisions of the Consent Judgment prohibited Madera from appealing the Trustee's removal decision and that the decision could not be stayed pending resolution of any appeal, concluding that only the union officers could appeal and that Madera's removal was immediate.

## IV

■ My evaluation of a removed employee's right to appeal from the Trustee's exercise of removal authority under the Consent

Judgment is based on two provisions of the Consent Judgment and general principles of law. Paragraph 8(a) states in relevant part:

In any case where the Trustee exercises removal authority, the removal shall take place immediately. The Trustee, upon request of the officers of Local 6A or the District Council, shall, within three (3) days, advise those officers of the reason for any removal. For a period of up to fourteen (14) days after the Trustee's decision, the union officers shall have the right to seek review of the Trustee's decision by this Court.

Focusing on Paragraph 8(a), the United States in support of the Trustee's position,[7] argues that the Consent Judgment vests the right to appeal solely in the District Council officers. The United States asserts that the Consent Judgment is in essence a bilateral contract that has been approved by the court, and that under principles of contract interpretation the specific provision quoted above precludes the right to appeal of the person sanctioned by the Trustee, because if the parties wished to grant such a right, they would have done so expressly.

■ In determining the issue raised by the Government, I have had recourse not only to Paragraph 8(a) but also to Paragraph 18, which is the general provision pursuant to which the court retains jurisdiction over the Consent Judgment. The doctrine of *expressio unius est exclusio alterius* is available as one tool for seeking to ascertain the intention of drafters of documents or the probable interpretation of readers, see *Cornell University v. UAW Local 2300,* 942 F.2d 138 (2d Cir.1991) (applying the doctrine to a collective bargaining agreement), but that canon need not be mechanically applied. See, e.g., *Cheney Railroad v. ICC,* 902 F.2d 66, 68–69 (D.C.Cir.), *cert. denied,* 498 U.S. 985, 111 S.Ct. 519, 112 L.Ed.2d 530 (1990).

■ The closely analogous principle that particular language of a document prevails over more general language, see *John Hancock Mutual Life Insurance Co. v. Carolina*

---

7. Opposition papers on this appeal have been filed only by the United States, which endorses

the limiting interpretation of Madera's rights under the Consent Decree made by the Trustee.

*Power and Light Co.*, 717 F.2d 664, 669 n. 8 (2d Cir.1983), likewise has relevance, but it is not by itself controlling.

■ In the document involved here, the plain language of Paragraph 18 sets forth jurisdiction for judicial review at the instance of the Trustee or any affected party:

> This Court shall retain jurisdiction to supervise the activities of the Trustee and to entertain any future application by the Trustee or the parties. This Court shall have exclusive jurisdiction to decide any and all issues relating to the Trustee's authority or conduct pursuant to this Judgment.

While the wording of Paragraph 18 is broader than that of Paragraph 8(a), the two provisions when viewed together offer alternative rather than mutually exclusive or preclusive avenues of appeal. Where seemingly conflicting provisions of a document reasonably can be reconciled, a court should do so and give effect to both. *Proyecfin de Venezuela v. Banco Industrial,* 760 F.2d 390, 395–96 (2d Cir.1985). This "basic tenet of contract law", *id.* at 395, applies to the Consent Judgment and Paragraphs 8(a) and 18.

■ Paragraph 8(a) assures that even if the individual is not aware of or fails to exercise a right to appeal, the union officials can demand reasons for the action and if appropriate can initiate review at their own instance. This is in keeping with the similar practice in collective bargaining—obviously relevant in the context of a trade union organization which seeks to further those very principles.[8]

■ Where a document on its face does not clearly and unambiguously disclose intent, the purpose of the document and general principles of law may be drawn upon. The purpose of the Consent Judgment is to foster the rooting out of corruption for the benefit of the public and employees represented by the union. This does not require the denial of important procedural safeguards to an individual threatened by legal sanctions.

■ Even where no specific right to review is written into the language of a governing document, courts assume that judicial review is available in connection with deprivation of substantial rights unless the document reflects "a clear and unmistakable intent" to exclude appellate review. *United States v. International Brotherhood of Teamsters (Friedman and Hughes),* 905 F.2d 610, 615 (2d Cir.1990) (involving Consent Decree under circumstances analogous to those here).

■ Where sovereign compulsion is exercised, the Framers of the Constitution assumed that the courts of law would be open to examine the legality of what is done. See *The Federalist* No. 78 (Hamilton).

■ In accordance with this tradition, courts recognize that only special circumstances—absence of any law to apply, availability of other avenues of judicial review apart from the one asserted, absence of any underlying rights to be asserted, or in some circumstances purely discretionary action not violating independent constitutional or other rights—can justify barring judicial review of administrative action without either violating the Constitution or at least raising profound constitutional questions. Absent such highly specialized circumstances, judicial review is available where sovereign compulsion is exercised.[9] See, e.g., *Webster v. Doe,* 486 U.S.

---

8. Unions are required to seek to represent all of the employees in the bargaining unit fairly and in good faith, but have substantial discretion in doing so. See 29 U.S.C. § 159; *Breininger v. Sheet Metal Workers,* 493 U.S. 67, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989); *Steele v. Louisville & Nashville Railroad,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (Stone, C.J.); *Eatz v. DME Unit,* 973 F.2d 64 (2d Cir.1992); *Taormina v. International Union,* 798 F.Supp. 193 (S.D.N.Y. 1992); Weyland, "Majority Rule in Collective Bargaining," 45 Colum.L.Rev. 556 (1945).

9. While an argument can be made that what was involved here was not sovereign compulsion but a bilateral contract approved by the court, the fact is that the contract (the Consent Judgment) was entered into to settle serious and potentially devastating claims made by the sovereign, and that the very provisions of the Consent Judgment bespeak compulsion by the sovereign. The United States obtained this Consent Judgment in furtherance of its law enforcement functions, which are similar to those involved in antitrust cases, treated as proper subjects for legislative regulation in connection with the statute being enforced. See 15 U.S.C. § 16(b)-(i) ("Tunney

592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *Lindahl v. OPM,* 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985); *Oestereich v. Selective Service Board,* 393 U.S. 233, 238, 89 S.Ct. 414, 417, 21 L.Ed.2d 402 (1968); *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); *Bartlett v. Bowen,* 816 F.2d 695 (D.C.Cir.), *reinstated* 824 F.2d 1240 (D.C.Cir.1987) (*en banc* consideration withdrawn); *Marozsan v. United States,* 852 F.2d 1469, 1477–79 (7th Cir.1988) (*en banc* ); see also *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978); *Philadelphia Co. v. Stimson,* 223 U.S. 605, 619–20, 32 S.Ct. 340, 344, 56 L.Ed. 570 (1912) (Hughes, J.).

There is no occasion here to infer limitations on judicial review based on special circumstances. The clause in Paragraph 8(a) providing that "the removal shall take place immediately" relates to the effect of an action by the Trustee, and is relevant to the burden of proof which must be met to justify a stay of the Trustee's action. It does not limit the availability of review.

The opportunity for judicial review of actions of trustees authorized to interfere in the affairs of labor organizations is of great importance to the public even apart from any constitutional requirements (and apart from the need to avoid unnecessary confrontation of constitutional questions). Governmental intrusion into the internal affairs of an organization the responsibilities of which are not primarily to the public (here those responsibilities run to the employees represented by the organization), is inherently hazardous to the purposes of such an organization.[10] This risk is partially overcome where the members of the organization retain the right to vote for candidates for union office without interference. This assures that they, not the Trustee, determine who holds union office unless banished for malfeasance and replaced

by another officer selected by the membership (not the Trustee).[11]

Review of sanctions imposed at the initial level is a way of mitigating the risk of improvident intervention in labor matters, recognized by Congress in the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.,* upheld in *Lauf v. E.G. Shinner & Co.,* 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872 (1938), limiting judicial intrusion into labor disputes by means of injunctive relief. See Handler, "Labor and Antitrust: A Bit of History," 40 Antitrust L.J. 233 (1971); Handler & Zifchak, "Collective Bargaining and the Antitrust Laws," 81 Colum.L.Rev. 459 (1981); Frankfurter & Greene, *The Labor Injunction* (1930); see also *Complete Auto Transit, Inc. v. Reis,* 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981); *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238, 244–49, 82 S.Ct. 1318, 1322–25, 8 L.Ed.2d 462 (1962).

Where the judiciary authorizes intervention in the affairs of an organization not part of the public sector, the courts must also supervise the exercise of the power granted to those carrying out such intervention.

I find that Madera may appeal his removal by the Trustee under the Consent Judgment.

### V

The evidence before the Trustee and applicable standards of conduct binding on Madera lead me to vacate the interim stay of the Trustee's action against Madera. The LMRDA imposes fiduciary duties on union officials, safeguards for labor organizations, and mechanisms indicating how such duties may be fulfilled and such safeguards may be implemented. See 29 U.S.C. § 401 *et seq.;* Bill of Rights of Members of Labor Organizations, 29 U.S.C. §§ 411–415; and Subchapter IV, § 461 *et seq.* One such mechanism is the establishment of a trusteeship by a labor organization over a subordinate body for such purposes as correcting corruption or

---

Act"). Different circumstances arise where litigation relates to matters arising in the Government's proprietary capacity.

**10.** History may to a certain extent forewarn of problems here. Destruction of employee self-determination within unions was a signal feature of foreign totalitarian regimes during this centu-

ry. The experience under totalitarian regimes underlines an inherent danger with respect to governmental intrusion in trade union activity.

**11.** Employees represented by a labor organization can also vote to decertify or replace it. 29 U.S.C. § 159.

financial malpractice, assuring the performance of the duties of a collective bargaining representative, and "otherwise carrying out the legitimate objects of such labor organization". 29 U.S.C. § 462 and Subchapter IV.

The trusteeship established by the Consent Judgment in the present case is in certain respects analogous to a trusteeship authorized by the LMRDA. The purpose of the trusteeship established by the Consent Judgment was to facilitate the rooting out of racketeering and the protection of union members and society from the poison of racketeering. Paragraph 8(a) of the Consent Judgment provides in relevant part that where the Trustee determines that removal is appropriate, "the removal shall take place immediately." The term "immediately" needs no interpretation; the Trustee is not required to initiate additional court action to effectuate a dismissal. If the mere fact that a person seeks review would operate as an automatic stay, the provisions of the Consent Judgment could be compromised, overridden, or brought to nought. Certainly the court has authority to stay the Trustee's decision; the provisions of Paragraph 8(a) strongly suggest that such authority should be sparingly exercised.

There being no specific provision in the Consent Judgment with respect to a stay, the criteria in evaluating Madera's application may be drawn from the traditional criteria courts utilize when such relief is sought.

■ The Supreme Court has set forth several factors an appellate court must consider in determining whether to stay an order pending appeal:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;

(2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987).

■ These definitions of general standards governing stays of civil judgments under Fed.R.Civ.P. 62(c) are instructive in considering Madera's application. The factors listed are similar to the standards applied in the Second Circuit for consideration of a request for a preliminary injunction under Fed.R.Civ.P. 65 or the All Writs Act, 28 U.S.C. § 1651. In such contexts, the moving party must demonstrate both (1) irreparable harm in the absence of the requested relief, and (2) either (a) a likelihood of success on the merits, or (b) a sufficiently serious question going to the merits combined with a balance of hardships tipping decidedly in favor of the moving party. *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1038 (2d Cir.1992); *Jackson Dairy v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979).

Where the determination on the merits is likely to be adverse to the claimant and, at the same time, the public interest militates against maintaining the status quo, the equities cannot tip in favor of the applicant.[12]

### 1. *The Merits*

■ Madera challenges the finding of malfeasance in each of the three incidents cited by the Trustee, asserting that none of the incidents "relates to the underlying purpose of the trusteeship: the need to rid the Unions of the influence of organized crime." Memorandum of Law in Support of Thomas Madera, Dkt. # 244, Jan. 25, 1993, at 6.

Paragraph 8(a)[13] provides that either an act of racketeering or an act of malfeasance

---

**12.** Madera asserts that an applicant may at times succeed even where there is little likelihood of success on the merits, citing *Territorial Court of the Virgin Islands v. Richards*, 674 F.Supp. 180, 181–82 (D.V.I.1987), *aff'd on the merits*, 847 F.2d 108 (3d Cir.), *cert. denied* 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 380 (1988). Such reasoning is unavailing here, since the public interest and Paragraph 8(a) also weigh against granting his application.

**13.** Paragraph 8(a) provides that one circumstance under which the Trustee may remove a union official is "whenever the Trustee reasonably believes that the person ... has engaged in conduct which constitutes or furthers an act of racketeering or malfeasance."

may be the basis for imposition of a removal sanction by the Trustee. This suggests that the parties included malfeasance not as a subcategory of racketeering but as a broader and independent source of assurance that individuals who assume fiduciary duties to the union and its members will adhere to agreements to which they are parties and to the mandates of applicable statutes.

Although each incident adds to the significance of the totality, a single act of malfeasance would be sufficient for disciplinary action by the Trustee under Paragraph 8(a). Since the Trustee sets forth a reasonable basis, grounded on a record of the investigation and depositions, for finding three acts of malfeasance, there is little likelihood that Madera could succeed on the merits of his defense.

### a. The embezzlement of initiation fees by a District Council clerical employee.

In 1989, Madera failed to report to the Trustee or to respond forthrightly to inquiry by the Trustee's deputy, concerning whether a District Council clerical employee had embezzled $5,120 of fees due from new union members. Madera discharged the clerical employee upon learning of the theft but deliberately concealed the facts behind the employee's departure from the Trustee's deputy, stating only that the employee left "for personal reasons". The rationale for the concealment was that Madera feared that the employee would be prosecuted.

Relying on *Black's Law Dictionary* as authority for defining the term malfeasance to include "any wrongful conduct that affects, interrupts or interferes with the performance of official duties," the Trustee determined that Madera's misrepresentation was malfeasance. The theft by the clerical employee constituted an act of racketeering as defined by 18 U.S.C. § 1961(1)(C) and 29 U.S.C. § 501(c). By failing to report the incident or to provide information about it, Madera interfered with the Trustee's right to be fully informed under paragraph 8(f) of the Con-

sent Judgment so as to "prevent acts of racketeering at Local 6A and the District Council." The Trustee found an additional act of malfeasance in Madera's "improper decision to write off" the $5,120 in stolen initiation fees.

Madera seeks to minimize the significance of misleading the Trustee [14] by arguing that even if the clerical employee had embezzled the funds, there were no further acts of racketeering to be prevented. Madera could not properly assume that the theft was an isolated incident or that others were not participating with her. Nor did Madera have reason to take it for granted that similar behavior would not continue absent revelation of the theft or an investigation by the Trustee. Individual instances of corruption are the stuff from which racketeering empires are built. If each individual incident can be ignored because it is not of union-shattering importance by itself, then an entire sequence of events which in the aggregate would undermine the structure could take place without counteraction.

As a signatory to the Consent Judgment, Madera was charged with responsibility to be aware of his duty to share information about any conduct that could reasonably be related to the purpose of the original action.

Madera seeks to excuse his conduct on the grounds that the District Council has not suffered a pecuniary loss as a result of the theft by the clerical employee because the fidelity bond company honored a claim filed by the District Council. Neither restitution of funds by the action of the District Council several years after the loss occurred, nor subsequent ratification by the District Council of Madera's failure to file a claim, excuse Madera's personal duty to the union and to the Trustee under the Consent Judgment. Avoiding loss of funds is only one reason for seeking to rein in tendencies toward corruption. See *United States v. Mongelli*, 794 F.Supp. 529 (S.D.N.Y.1992).

The sympathy factors relevant to the lower level employee who took the money [15] but

---

14. The Trustee learned of the reason for the clerical employee's termination when alerted by the U.S. Department of Labor of disclosure in a District Council report.

15. Madera testified at deposition that he felt he had "really hurt [the clerical employee] quite a bit" by discharging her. She had been a long-

was discharged by Madera may be available to the employee involved but hardly to Madera, whose decision to protect her from possible prosecution may be understandable but is scarcely excusable.

### b. The Legal Services Fund Investment.

Madera was a member of the Board of Trustees of the Fringe Benefit Funds and represented the employees on the committee that recommended that monies from the Legal Services Fund be invested in an Equitable Financial Services Retirement Investment Account ("Equitable RIA"). The Trustee found that the committee made its recommendation "[a]t Thomas Madera's behest," that Madera knew that his son was an Equitable agent and would receive commissions if the Board adopted the recommendation, and that his son in fact earned "substantial commissions".[16]

The Trustee determined that this was a party-in-interest transaction by a plan fiduciary within the meaning of ERISA, 29 U.S.C. §§ 1002(14)(F), (15), and, as such, prohibited under 29 U.S.C. § 1106. That statute provides that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know such transaction constitutes a direct or indirect ... furnishing of goods, services, or facilities between the plan and a party in interest."

The Trustee also found that Madera violated 29 U.S.C. § 501(a), which requires union officials to "hold money solely for the benefit of the organization and its members" and "to refrain from ... acquiring any pecuniary or personal interest which conflicts with the interest of such organization." Madera's efforts thus constituted malfeasance because they involved the commission of a positively unlawful act.

Madera challenges the Trustee's construction of this conduct as malfeasance on the

grounds that Madera did not "wilfully" engage in misconduct and concealed neither the transaction nor his son's role in it. Aside from the fact that nothing in the Consent Judgment requires criminal intent, this is not a case of unintentional mistake.

Madera cannot exonerate himself by asserting that the other committee members knew about his son's relationship to him and to the investment. Madera alone represented the union membership on the committee and on the Board. Madera knew that his son stood to benefit from the investment and Madera knew or should have known that he had a duty to be aware of the law or to seek legal counsel. The possibility of a conflict where close relatives participate in the business transactions of a fiduciary is not a surprising or obscure concept. Even if other committee members or trustees were aware of the relationship,[17] said nothing, and were possibly negligent themselves, Madera is not relieved of responsibility if he committed an act that was positively unlawful. The significance, if any, of the approval of others might be to suggest that broader malfeasance or corruption may exist. It was Madera who represented the employees and it was he who owed a fiduciary duty to the union rank and file.

### c. The investment of Dues Escrow Account monies.

In January 1989, Madera as President and without approval from the Executive Council directed that funds in the District Council's Dues Escrow Account be invested in an Equitable RIA from which his son derived substantial commissions. The Trustee found that Madera had committed an act of malfeasance because the investment decision constituted an "impermissible and illegal dual loyalty" under 29 U.S.C. § 501(a) to Madera's personal interests and to those of the union. The Trustee also found that Madera's investment decision was a wilful violation of the

---

time employee, and was a single parent who was the family's sole source of income.

**16.** The commissions to John Madera were apparently later reversed. That fact does not change the relationship of Madera to the original transaction.

**17.** There is considerable dispute as to which, if any, members of the Board of Trustees or its Investment Committee were aware that John Madera would earn commissions from the investment.

District Council Constitution provision authorizing the Executive Board to determine how union funds are to be invested.

Even if this investment was specifically approved by the District Council's Secretary–Treasurer, as Madera alleges, the reasoning set forth above with respect to a possible conflict between union interests and the personal or pecuniary interest of those entrusted with fiduciary responsibility applies to the Dues Escrow Account investment as well.

### 2. *Other factors*

In balancing the equities in regard to the stay application before me in light of the Consent Judgment and its intent, weight must be given to the right of the union to run its own affairs, a factor supported by the right of appeal by the District Council and its officers provided by Paragraph 8(a) of the Consent Judgment.

The approach must be evenhanded. The consequences for Madera of the sanction imposed—he was suspended from his paid employment for a minimum of six months—might be worthy of consideration if the necessity for the disciplinary action was questionable. But here the evidence indicated that Madera was clearly guilty of actions which the Trustee reasonably found to constitute malfeasance.

■ Collective bargaining representatives of employees, given exclusive bargaining authority by federal law, owe a duty of fair representation to the employees they represent. See *Steele v. Louisville & Nashville Railroad,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) and other citations in footnote 8 above. Protection of the interests of the employees represented by a labor organization from corrupt practices on the part of those purporting to act on their behalf is crucial.

Intervention to overcome corrupt behavior in labor organizations is important to members of the organization and to the general public. The purpose of the Consent Judgment, and the role of the Trustee in helping to fulfill that purpose, include assurance to members and to the public that no officer or

employee of Local 6A or of the District Council will engage in any activity that will expose the union, its members, and its employees to the influence of racketeering.

This highlights the significance of the clause in the provision serving as the Trustee's charter which permitted immediately effective action where malfeasance is found, and the need for care in granting stays of discipline meted out by the Trustee where malfeasance has been shown. A stay should not be granted without a showing of likelihood of success on the merits where the purposes of the Consent Judgment would, as here, be adversely affected.

### VI

Based on the facts before me, a disposition of this appeal on the merits is possible and hence appropriate, subject to an opportunity for the parties to make further submissions if these might alter the outcome.

■ In the absence of specific guidance from the Consent Judgment, I refer to the criteria found applicable by the Second Circuit to district court review of decisions of an independent administrator appointed under a consent decree in Teamsters Litigation, *United States v. International Brotherhood of Teamsters (Sansone),* 981 F.2d 1362, 1368 (2d Cir.1992). In the present closely parallel circumstances, I give "great deference" to the determination made by the Trustee, *id.,* (quoting *United States v. International Brotherhood of Teamsters (Parise),* 970 F.2d 1132, 1137 [2d Cir.1992] [citation omitted] ).

Thus my review of the Trustee's decision is limited to whether that administrative determination was arbitrary or capricious.

■ Applying this standard to the undisputed underlying events relating to the embezzlement incident involving the District Council clerical employee and the role of Madera in the investment of union funds resulting in financial benefit to his son, I find that the Trustee acted reasonably. The Trustee reasonably found that the acts by Madera at issue did constitute malfeasance. There is no evidence, in the facts or in the papers presented, that suggest that the

Trustee's decision was either arbitrary or capricious.

I further find no basis for the contention that delay to the extent attributable to the Trustee misled or prejudiced the union official and employee involved where, as here, a reasonable person would know or should have known that an act of malfeasance had occurred, such as the failure to report the theft by the clerical employee.[18]

 Madera also claims that his removal is inconsistent with the fact that the Trustee permitted him to remain as president of the District Council for a time after learning about the embezzlement incident. Madera points out that the Trustee also allowed him to stand for re-election as president on two occasions in the three-year period during which Madera's conduct was under investigation.

Government intervention to take over a union is a hazardous undertaking. For that reason alone, as indicated in part II above, the federal government, represented here by the Trustee, should not prevent anyone from running for office. To do so would contravene the ultimate sovereignty of the employees represented by the union. Thus the public interest was served by the Trustee's proper exercise of restraint with respect to the election process.[19] It was also served by the immediate removal of Madera, once the Trustee's investigation had been completed.

There is no factual dispute requiring a hearing in connection with Madera's request for a stay. Sufficient facts have been presented to me to permit me to treat the motion for a stay as consolidated with the plenary appeal on the merits. Such treatment is analogous to Fed.R.Civ.P. 65(a)(2), permitting consolidation of a hearing on an application for a preliminary injunction with trial on the merits.

However, since the parties may not have framed their submissions on the stay application with a final ruling on the merits in mind, entry of final judgment dismissing this appeal on the merits will be delayed for a period of forty-five (45) days following issuance of this opinion to permit any party to move for modification with respect to the ultimate merits of the appeal, provided that genuinely new arguments or evidence are provided.

## VII

I leave the Trustee's action in place, including the Trustee's recommendation that I consider reinstatement of Madera after six months of suspension, once he makes such an application to me.

My lifting of the emergency stay of the Trustee's suspension making it effective immediately as called for by the Consent Judgment, will, unless itself stayed, cause irreparable injury to the union employee who will be out of a job for at least six months. On the other hand, the interests underlying the trusteeship would be irreparably impaired if mere filing of an appeal can automatically stay suspension imposed for good reason under the Consent Judgment.

This kind of conflict is dealt with in the criteria set forth by the United States Supreme Court in *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987), quoted above. I conclude that lack of significant probability of success on the merits and the strong weight to be given to the public interest would be fatal to relief in the form of a stay of my decision pending appeal.

**18.** Madera stated in his deposition that "a lot of things would have been a lot better off not being spoken about, and [the District Council clerical employee incident is] one of them". This indicates that Madera was well aware that the incident involving embezzlement of union funds was improper.

**19.** The assertion that the Trustee should have moved sooner calls for a Hobson's choice between a rush by the Trustee to sanction union officials on shaky evidence, on the one hand, or vulnerability to a defense of having ratified misbehavior by not having acted more quickly, on the other. The doctrine of laches is not applicable here because no prejudice has been shown to have been brought about by the delay. See generally *Bourne Co. v. Tower Records*, 976 F.2d 99 (2d Cir.1992).