**UNITED STATES of America, Plaintiff,**

v.

**DISTRICT COUNCIL OF NEW YORK CITY AND VICINITY OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, et al., Defendant.**

No. 90 Civ. 5722 (CSH).

United States District Court,
S.D. New York.

July 24, 1997.

Mary Jo White, U.S. Atty., Southern District of New York, New York City (Marla Alhadeff, of counsel), for U.S.

Kenneth Conboy, Investigations and Review Officer, Latham & Watkins, New York City, Dublirer, Haydon, Straci & Victor, New York City, Bisceglie & Friedman, Newark, NJ, Thomas E. Moseley, Newark, NJ, Freeman, Forrest & Chenetz, L.L.P., New York City, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, New York City, Decarlo, Connor & Selvo, Los Angeles, CA, for Intervenors.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This matter is currently before the Court on motions by two separately represented groups of petitioners to intervene in this action.

The petitioners represented by the firm of Dublirer, Haydon, Straci & Victor, hereinafter referred to as the "Macagnone Petitioners," seek leave to intervene as of right pursuant to Rule 24(a), Fed.R.Civ.P., or alternatively by permission under Rule 24(b), and also for class certification under Rule 23. The second group of petitioners, represented by the firm of Bisceglie & Friedman and hereinafter referred to as the "Local Petitioners," join in the motion to intervene, although not in the motion for class certification.

The purpose of the proposed interventions, according to both sets of petitioners, is to urge the Court to (1) reject a series of restructuring measures (the "Restructuring Plan") proposed by the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "District Council") and its parent union, the United Brotherhood of Carpenters and Joiners of America (the "UBC"); and (2) "restor[e] the democratic process of the locals." Macagnone Petitioners' Notice of Motion at ¶ 2; Local Petitioners' Notice of Motion at ¶ 2.[1] The government, the IRO and the District Council oppose all aspects of these petitions.

For the reasons set forth below, the motions are denied in their entirety and the petitions are dismissed.

## I.

The long history of this case has been set forth in this Court's prior opinions, including its opinion dated July 7, 1997 in a related case, *Devine v. McCarron*, 96 Civ. 5093(CSH), 1997 WL 379708. Familiarity with all these opinions is presumed. For present purposes, it is sufficient to recite the following facts.

In September 1990, the government filed a civil RICO action for injunctive relief against the District Council and certain of its offi-

---

1. The Macagnone Petitioners also seek to have Kenneth Conboy replaced as Investigations and Review Officer (hereinafter referred to as the "IRO"). I consider this to be a free-standing prayer for relief not implicated by the present motion to intervene. Accordingly, it will be addressed in a separate opinion.

cers, including the District Council President, Frederick W. Devine. The complaint alleged that the individual defendants had engaged in a variety of forms of labor racketeering, and that organized crime had infected the operations of the District Council and its constituent locals, resulting in these entities being maintained in a corrupt and undemocratic manner. The litigation was terminated on March 4, 1994, when the parties entered into a Consent Decree.

The Consent Decree permanently enjoined all current and future officers, employees and members of the District Council and its constituent locals from engaging in any racketeering activity, from knowingly associating with any member of any La Cosa Nostra crime family or other criminal group, and from obstructing or otherwise improperly interfering with the implementation of the Consent Decree. Consent Decree, ¶ 2. The Consent Decree also required the constituent locals to adopt certain job referral rules and procedures, and prohibited any District Council officer from simultaneously holding any elected, appointed or salaried position in any local union. Consent Decree, ¶¶ 5, 10. To effectuate and implement the terms of the Consent Decree, an Investigations and Review Officer ("IRO") was appointed by the Court and given a variety of "powers, rights, and responsibilities." Consent Decree, ¶ 4.

One of the IRO's duties under the Consent Decree was to draft rules for and supervise a rank-and-file secret ballot election for the District Council Executive Board. That election was held in June 1995, and resulted in the re-election of Devine and several other District Council officers who were defendants in the original civil RICO litigation. Finding no violations of the election rules that may have effected the outcome of the election, the IRO certified the results to the Court on October 30, 1995.

However, in the spring of 1996, the IRO found evidence of the continuing influence of organized crime over the District Council and financial mismanagement at the District Council. The IRO presented that evidence

to the General President of the UBC, Douglas McCarron. On June 25, 1996, McCarron invoked his authority under the UBC constitution and federal labor law by placing the District Council under supervision.[2] As part of the supervision, the five sitting officers of the District Council were removed and Douglas Banes, First Vice President of the UBC, was appointed supervisor.

In addition to imposing supervision on the District Council, the UBC announced plans to restructure District Council operations. News of an impending restructuring prompted a substantial number of rank-and-file union members to write to the Court, some opposing and some supporting the proposed reforms. Following a hearing on April 3, 1997, at which additional rank-and-file union members expressed their views on the proposed restructuring, and the receipt by the Court of additional letters on the subject from union members, the present motions to intervene were filed by the two law firms named above on behalf of a number of individual union members and various local unions. According to the petitions, these individual union members and local unions seek leave to intervene in this matter so that they may object to the Restructuring Plan as contrary to the letter and spirit of the Consent Decree.

Prior to the conclusion of briefing on these motions, the IRO submitted a Special Interim Report, dated May 30, 1997, setting forth his conclusion that the District Council Restructuring Plan was "entirely consistent with the terms and objectives of the Consent Decree." By letter dated June 12, 1997, the government joined in the IRO's conclusions. Having received this approval from both the IRO and the government, the District Council, still operating under supervision, informed the Court that it planned to implement the Restructuring Plan immediately. On June 16, 1997 the Court held a hearing on the motions to intervene. At the conclusion of that hearing, I entered a stay of implementation, so that the motions could be carefully considered on their merits before the

---

**2.** The legality of this supervision is the subject of a separate lawsuit in this Court, *Devine v. McCar-* *ron,* 96 Civ. 5093(CSH), 1997 WL 379708.

District Council made any substantial changes.

Having completed that consideration, the Court denies the motions to intervene and the motion for class certification, and vacates the stay.

## II.

### A

■ The District Council and the IRO contend that this Court has no authority under the Consent Decree to subject the Restructuring Plan to judicial review. This threshold issue must be resolved. If this Court does not have the power to review the Restructuring Plan, then intervention by the petitioners in this action, for the purpose of objecting to a Plan that the Court cannot review, becomes a futile endeavor. The answer to this threshold issue lies in the nature and the wording of the Consent Decree, which brought to an end the civil RICO action commenced by the United States.

■ Although consent decrees are a hybrid of contract and judicial pronouncement, they "should be construed basically as contracts." *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975). Accordingly, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). "The court is not entitled to expand or contract the agreement of the parties as set forth in the consent decree, and the explicit language of the decree is given great weight." *Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985) (citations omitted). Similarly, "[a] court may not replace the terms of a consent decree with its own, no matter how much of an improvement it would make in effectuating the decree's goals." *United States v. Inter-*

national Brotherhood of Teamsters, 998 F.2d 1101, 1107 (2d Cir.1993).

The dispute between the proposed intervenors and the parties to this action centers on whether the Consent Decree requires prior court approval of the Restructuring Plan. The petitioners argue that ¶ 4(g) of the Consent Decree requires court approval before the District Council may implement the Plan. The District Council, the government, and the IRO disagree; they assert that ¶ 12, rather than ¶ 4(g), is the appropriate provision.

■ Construing the Consent Decree "as it is written," *Armour,* 402 U.S. at 682, 91 S.Ct. at 1757, I conclude that prior court approval of the Restructuring Plan is not required.[3]

Paragraph 4 of the Consent Decree, titled "The Investigations and Review Officer," sets forth the "powers, rights and responsibilities" of the IRO. Specifically, ¶ 4(g) vests the IRO with the authority to "study the operations of the District Council and its constituent locals, and ... recommend changes to improve those operations." Furthermore, "[u]pon notice to the Government and the District Council, the Investigations and Review Officer shall apply to the Court for approval of the final recommendations, if any, concerning improvements to the rules and procedures of the District Council and its constituent locals." Consent Decree, ¶ 4(g). Thus, while ¶ 4(g) clearly requires prior court approval, that provision by its express terms applies only to changes proposed by the IRO.

In contrast, changes initiated by the District Council are governed by ¶ 12 of the Consent Decree, titled "Future Practices." According to this paragraph,

> The parties intend the provisions set forth herein to govern the District Council's practices in the areas affected by this Consent Decree, now and in the future. The District Council shall give prior written

---

3. If the language of a consent decree is ambiguous, a court may also rely on standard "aids to construction," such as "the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." *ITT Continental*

*Baking Co.,* 420 U.S. at 238, 95 S.Ct. at 935. Since I perceive no ambiguity in the Consent Decree for the reasons stated below, resort to such extrinsic evidence is unnecessary. *See EEOC v. Local 40,* 76 F.3d 76, 80 ("Extrinsic evidence should only be considered when the decree itself is ambiguous.").

notice to the Government and to the Investigations and Review Officer of any proposed changes to the By–Laws. In addition, the District Council shall inform the Government and the Investigations and Review Officer of any changes in any rules or procedures adopted or implemented pursuant to paragraphs 4(g) [changes originally proposed by the IRO], 4(h) [job referral procedures], 4(i)(3) [election rules], 5 [job referral rules], 9(c) [future election procedures], and 10 [prohibition on multiple officeholding] of this Consent Decree. [ ] If the Investigations and Review Officer or the Government objects to the proposed change as inconsistent with the terms or objectives of this Consent Decree, the change shall then not occur, *provided that,* upon such objection the District Council may apply to the Court for a determination as to whether the proposed change is consistent with the terms and objectives of this Consent Decree.

Consent Decree, ¶ 12.

This provision contains no requirement of prior court approval similar to that included in ¶ 4(g). Judicial review is contemplated only if the District Council itself seeks review of a de facto veto by the government or the IRO. Accordingly, since the present matter involves District Council-initiated changes to which neither the government nor the IRO objects, prior court approval is not required.

The Macagnone Petitioners argue that ¶ 4(g) applies because the Restructuring Plan is actually being proposed by the IRO, not the District Council, which they argue has no independent existence apart from the UBC. Whatever may be the proper perception of the District Council after the UBC placed it under supervision, petitioners' argument that the IRO must be regarded as having proposed the Restructuring Plan is meritless. The Restructuring Plan is not an IRO-initiated proposal. The IRO has done nothing more with respect to the Plan than exercise his authority, pursuant to ¶¶ 4(f)(1), 4(k), and 12 of the Consent Decree,[4] to review proposed changes to District Council operations and report to the Court about them.

The Macagnone Petitioners contend that since the Restructuring Plan has been proposed by the UBC, it cannot be regarded as proposed by the District Council, so that ¶ 12 of the Consent Decree does not apply. Assuming that ¶ 12 does not apply, it hardly follows, as petitioners seem to argue, that ¶ 4(g) must. For the reasons just stated, the Plan was not proposed by the IRO in such a manner as to require court approval under ¶ 4(g).

Two conceptual possibilities arise. Although initiated by the UBC, the Restructuring Plan may be regarded as proposed by the District Council under the supervision of the UBC. If that concept is correct, then the Plan is a District Council proposal, and ¶ 12 applies, leading to the conclusion that court approval is not required for implementation.

The second conceptual approach is to characterize the Restructuring Plan as a UBC proposal *simpliciter,* so that there is no District Council involvement, directly or by implication through supervision. The consequence of that concept is that neither ¶ 4(g) nor ¶ 12 operate to provide for court review.

The UBC, the government, and the IRO do not fully address this question in their submissions. In the Court's view, a substantial basis exists for regarding the Restructuring Plan as a District Council proposal, ·de jure if not de facto. Although subsequent to the entry of the Consent Decree the UBC placed the District Council under supervision, that did not cause the District Council to vanish. Within the context of the Consent Decree, the District Council continues to exist and to act. Nothing in the Consent Decree or in the litigation preceding its entry requires a different conclusion. The government's civil RICO suit against the District Council and certain individuals did not implicate the UBC in any way; nor was there a factual basis for doing so. The Consent De-

---

4. The pertinent provisions of ¶ 12 of the Consent Decree are quoted in text. ¶ 4(f)(1) provides that the IRO "shall have the authority to review certain practices of the District Council and its constituent locals," and goes on to specify those practices. ¶ 4(k) permits the IRO to report to the Court whenever he deems it necessary, and requires the IRO to file a written report of his activities with the Court not less than every six months.

cree says nothing about the UBC's powers to act under its constitution, by-laws, and the Federal labor laws; nor was there a basis in law for doing so. I will accept the proposition that when the parties negotiated the Consent Decree, they did not foresee or contemplate that the UBC would thereafter place the District Council under supervision. But conceptually at least, that possibility existed; the UBC, its constitution and by-laws were in existence when the government commenced this action, and when the Consent Decree was entered.

In these circumstances, there is much to be said for the conclusion that the District Council, albeit under UBC supervision, remains a legal entity separate from the UBC; and that in consequence, the Restructuring Plan must be regarded in law as a change initiated by the District Council within the context of ¶ 12 of the Consent Decree.

But I need not pursue the question further because, assuming that the Restructuring Plan should be regarded as the handiwork of the UBC alone, the Macagnone Petitioners are no better off. In that circumstance, the Court's power to review the Restructuring Plan must be found in its inherent equitable responsibility to enforce the Consent Decree, a subject covered under Point II(B), *infra*, which concludes that no basis exists for disapproving the Plan.

The Local Petitioners argue that, even accepting the proposition that the Restructuring Plan is a District–Council initiated change, it was the intent of the parties to the Consent Decree that all proposed changes to District Council operations, no matter the source, be presented to this Court for approval. They contend that it would be anomalous, and therefore an unreasonable interpretation of the Consent Decree, for the court approval requirement to hinge on the identity of the advocate of the change, rather than the change itself.

However, this argument is belied by the plain text of the Consent Decree. As discussed above, there is no language in the Consent Decree requiring court approval of District Council-initiated changes when neither the IRO nor the government objects to the proposal. *See* Consent Decree, ¶ 12.[5] Yet it is clear that the parties knew how to include such language when necessary. *See* Consent Decree, ¶ 4(g) ("The Investigations and Review Officer shall apply to the Court for approval of the final recommendations, if any, concerning improvements to the rules and procedures of the District Council and its constituent locals."). Under these circumstances, there is no support for the proposition that the drafters intended all changes to District Council operations, even those emanating from the District Council itself, to be submitted to this Court for approval.[6]

Moreover, the Consent Decree's focus on the identity of the proposer is not unreasonable. There is a quantum difference between structural changes proposed by a court-appointed officer such as the IRO, and changes proposed by the District Council itself.

In exchange for the termination of the civil RICO litigation pending against it, the District Council agreed to allow a court appointed officer to have considerable oversight of its operations. Such an "intrusion into the internal affairs of an organization the respon-

---

**5.** I similarly reject the Local Petitioners' attempt to characterize ¶ 12 of the Consent Decree as a mere procedural paragraph. Rather, ¶ 12, entitled "Future Practices," is a substantive paragraph setting forth the District Council's ongoing obligations under the Consent Decree.

**6.** The Local Petitioners argue that the absence of a court approval requirement with respect to District Council-initiated changes can be explained by the drafters' expectation that the government and the IRO would never approve of District Council-initiated changes. I disagree. The Consent Decree itself explicitly contemplates supervised elections for District Council officers. Consent Decree, ¶ 4(i). Thus, at the time the

Consent Decree was executed, it was entirely foreseeable that new leadership would be installed at the District Council with goals sympathetic to those of the government and the IRO. The fact that this scenario did not, in fact, occur does not mean that the drafters did not consider the possibility when framing the Decree. My analysis is not altered by the fact that the current alignment of interests occurred as a result of supervision by the UBC, rather than by election. As suggested in text *supra*, it is an equally reasonable assumption that the parties were aware of the UBC's power to place the District Council under supervision at the time the Consent Decree was drafted.

sibilities of which are not primarily to the public ... is inherently hazardous to the purposes of such an organization." *United States v. Local 6A*, 832 F.Supp. 674, 681 (S.D.N.Y.1993). Under such circumstances, "[t]he opportunity for judicial review of actions of trustees authorized to interfere in the affairs of labor organizations if of great importance to the public...." *Id.* Accordingly, "[w]here the judiciary authorizes intervention in the affairs of an organization not part of the public sector, the courts must also supervise the exercise of the power granted to those carrying out such intervention." *Id.*

Applying this principle to the case at bar, it is entirely reasonable for the Consent Decree to require court approval of IRO-proposed changes to District Council operations, while not requiring approval for changes proposed by the District Council itself, when neither the government nor the IRO objects.[7]

For the foregoing reasons, I conclude that under the plain language of the Consent Decree, implementation of the Restructuring Plan is not conditioned upon the Court's approval of the Plan.

## B

█ However, to say that prior court approval of the Restructuring Plan is not required is not to say that judicial review is barred under any circumstances. This Court is not powerless to prevent implementation of the Plan should it run contrary to the terms of the Consent Decree.

7. In support of their argument that court approval of the Restructuring Plan is required, the Local Petitioners point out that the Consent Decree is "replete with references to judicial review." It is significant that each of the cited references involves judicial oversight of the IRO or the Independent Hearing Committee, but not the District Council. *See* Supp. Mcm. at 20. However, ¶ 12 of the Consent Decree arguably controls the case at bar; and the only right of judicial review conferred by that paragraph inures to the benefit of the District Council, should the IRO or the government object to changes proposed by the Council.

8. Although this inherent authority ends when the consent decree expires, *Local 40*, 76 F.3d at 80, the Consent Decree in this case remains in full force. *See, e.g.*, Consent Decree, ¶ 12 ("The parties intend the provisions set forth herein to govern the District Council's practices in the

█ Although a consent decree embodies the negotiated agreement of the parties, it is also an order of the Court. *ITT Continental Baking Co.*, 420 U.S. at 236 n. 10, 95 S.Ct. at 934 n. 10. As such, a consent decree "contemplates judicial interests apart from those of the litigants," *E.E.O.C. v. Local 580*, 925 F.2d 588, 593 (2d Cir.1991), and creates an affirmative duty on the part of the Court "to protect the integrity of its decree," *Berger*, 771 F.2d at 1568. Part of that duty is ensuring compliance with the decree, "an equitable goal which a court is empowered to pursue even absent a finding of contempt." *Berger*, 771 F.2d at 1569; *see also Local 580*, 925 F.2d at 593 ("Until parties to such an instrument have fulfilled their express obligations, the court has continuing authority and discretion—pursuant to its independent juridical interests—to ensure compliance."); *United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 69 (2d Cir.1995) (holding that a consent decree, by its nature, vests the court with "equitable discretion to enforce the obligations imposed on the parties.").[8] Accordingly, this Court has the inherent equitable authority to prevent implementation of the Restructuring Plan if it violates the District Council's obligations under the Consent Decree.

The IRO and the government have both concluded that the Restructuring Plan does not violate the Consent Decree; rather, it advances its objectives.[9] Those views, while

areas affected by this Consent Decree, now and in the future."). The District Council must continue to give the government written notice of any intended structural changes for a period of seven years "after the termination of the [IRO's] term of office," which has not yet occurred, the IRO's original term having been extended by stipulated order. And the reference in ¶ 12 to "now and in the future" is arguably open-ended as to time, although that question is not presently before me and I need not address it.

9. The IRO identifies the overarching goal of this litigation as freeing the District Council, its constituent locals, and union members "from the grasp of racketeers," and concludes: "It is my considered opinion and advice that the restructuring plan presents a well-considered system of administration and governance, which is consistent with the terms and objectives of the Consent Decree." IRO's Special Interim Report dated

certainly probative on the issue, are not determinative. It remains open for the proposed intervenors to argue, as indeed they do, that they have a substantial interest in the presently existing structures which is not "adequately represented by existing parties," a criterion for intervention as of right under Rule 24(a). As to that criterion, the proposed intervenors argue that the District Council, operating under UBC supervision, cannot adequately represent them, since they opposed supervision in the first place. They say that the government has abandoned its role as effective *parens patriae* for union members. And the proposed intervenors are vehemently critical of the IRO; they profess to perceive "the transformation of Kenneth Conboy" from an independent Court-appointed officer "into an apologist for Douglas McCarron." Main brief for Macagnone proposed intervenors at 21.

I do not presently address those professed concerns because, on this aspect of the case, a threshold question arises comparable to that discussed under Part II(A) of this opinion. To demonstrate a right to intervene under Rule 24(a), or a basis for permissive intervention under Rule 24(b), the present movants must at the very least articulate a theory that implementation of the Restructuring Plan would violate a provision of the Consent Decree. *See* Fed.R.Civ.P. 24(a) (intervenor must have "an interest relating to the property or transaction which is the subject of the action. . . ."); Fed.R.Civ.P. 24(b) (intervenor's claim and the main action must have "a question of law or fact in common."). That is because this Court in this litigation does not have plenary jurisdiction to consider all issues that might arise under the Federal labor laws with respect to the conduct of the UBC *vis-a-vis* the District Council and its constituent locals. In the case at bar, the Court is concerned only with the proper implementation of the Consent Decree. *See Washington Electric Cooperative, Inc. v. Massachusetts Municipal Wholesale Electric*

*Co.*, 922 F.2d 92, 97 (2d Cir.1990) (holding that intervention "is not intended to allow for the creation of whole new suits by intervenors" and "cannot be used as a means to inject collateral issues into an existing action.").

In an effort to make that threshold showing, the proposed intervenors focus upon the fifth of eight prefatory "Whereas" paragraphs that precede the substantive provisions of the Consent Decree. That paragraph reads:

WHEREAS, the parties agree that one of the purposes of this Consent Decree is to ensure that the District Council and its constituent local unions shall be maintained and run democratically, and without unlawful influence from outside its membership; . . .

To place this language in context, I set forth below the entire prefatory portion of the Consent Decree:

WHEREAS, plaintiff United States of America (the "Government") commenced this action on September 6, 1990, by filing a complaint under the civil remedies provision of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), seeking equitable relief against the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (the "District Council"), and certain individual defendants, including Frederick W. Devine;

WHEREAS, a supplemental complaint was filed on July 16, 1991 naming certain additional defendants, including Robert J. Cavanaugh;

WHEREAS, trial of the case began on September 13, 1993 and continued through October 18, 1993, when it was temporarily recessed;

WHEREAS, the District Council acknowledges that former officers and representatives of the District Council and cer-

---

May 30, 1997, at 22. The government, after reviewing the measures proposed by the Restructuring Plan, concludes that the Plan "is fully consistent with both the terms and objectives of the Consent Decree," and adds: "The reforms ordered by this Court in the Consent Decree

were the product of intense negotiation after years of litigation. The Government is firmly committed to sustaining those reforms. Nothing in the Restructuring Plan, however, appears to threaten them." Letter of AUSA Marla Alhadeff dated June 12, 1997, at 1, 2.

tain of its constituent locals have been convicted of labor racketeering;

WHEREAS, the parties agree that there should be no criminal element or La Cosa Nostra corruption of any part of the United Brotherhood of Carpenters and Joiners of America (the "UBCJA"), including the District Council and its constituent local unions, *viz.,* UBCJA Locals 17, 20, 135, 246, 257, 296, 348, 531, 608, 740, 902, 1164, 1456, 1536, 2155, 2287 and 2710 (hereinafter collectively referred to as the "constituent locals");

WHEREAS, the parties agree that one of the purposes of this Consent Decree is to ensure that the District Council and its constituent local unions shall be maintained and run democratically, and without lawful influence from outside its membership;

WHEREAS, the District Council has entered into this Consent Decree as the representative of its membership and the union members who comprise its constituent local unions; and

WHEREAS, defendants Frederick W. Devine and Robert J. Cavanaugh (the "current officer defendants") and the District Council, without admitting or denying any of the allegations of the complaint, have agreed with the Government to settle this litigation as against them on the terms set forth in this Consent Decree;

IT IS HEREBY ORDERED AND DECREED as follows. . . .

When viewed in context, it is readily apparent that the language upon which the proposed intervenors rely is no less, but no more, than one of several declarations affirming the government's sole purpose in bringing this action, namely, ridding the District Council and its constituent locals of the influence of organized crime. The parties' expressed agreement in the quoted "Whereas" paragraph that the Council and the locals "shall be maintained and run *democratically* " must be read in context to mean that they will be maintained and run free of the undemocratic processes of organized crime. The phrase "without unlawful interference from *outside its membership* " means interference from organized crime. That limited interpretation necessarily follows from the nature of the case. The pervasive influence of organized crime constituted both the government's sole purpose in commencing this action, and its sole jurisdictional predicate. In commencing the action and thereafter terminating it by agreeing to the Consent Decree, the government was entirely unconcerned with the UBC's powers under its constitution; nor could it have been otherwise. This prefatory paragraph in the Consent Decree cannot be divorced from the case which gave rise to the document containing it.

The proposed intervenors take this language out of context and inflate it beyond all reason. They appear to regard this paragraph, prefatory to a Consent Decree disposing of a discrete and limited (albeit important) action commenced by the government, as expanding upon, if not supplanting, remedies available to union members under Federal labor statutes. The UBC has sought to impose comparable restructurings upon other local unions in the nation; locals with objections comparable to those voiced by the proposed intervenors at bar have commenced plenary actions under those statutes to challenge them.[10] Presumably the fact that

**10.** *See, e.g., United Brotherhood of Carpenters and Joiners of America, Lathers Local 42–L v. United Brotherhood of Carpenters and Joiners of America,* 73 F.3d 958 (9th Cir.1996) (rejecting Local's claim brought pursuant to § 301 of the Labor Management Relations Act (LMRA) that UBC and District Council breached Affiliation Agreement by seeking to compel Local to comply with amendments to by-laws that grant exclusive control over the selection of business representatives to the District Council; holding that by-law amendments did not violate UBC constitution); *United Brotherhood of Carpenters and Joiners of America, Dresden Local No. 267 v. United Broth-*

*erhood of Carpenters and Joiners of America, South Central Ohio District Council,* 992 F.2d 1418 (6th Cir.1993) (rejecting Local's claim brought pursuant to § 301 of the LMRA and the Labor Management Reporting and Disclosure Act (LMRDA) that new by-laws proposed by the UBC as part of a reorganization plan that eliminated the right to elect business representatives violated the UBC constitution; holding that dissolution and merger of local did not violate LMRDA); *Local 1052 v. Los Angeles County District Council of Carpenters,* 944 F.2d 610 (9th Cir.1991) (rejecting Local's claim brought pursuant to the LMRA and the LMRDA that merger of

these statutory challenges to the UBC in other judicial circuits have met with scant success fuels the present movants' desire to find broader or different remedies in the quoted language from this Consent Decree. But the nature of the case and the purpose of the Decree do not allow for so expanded a reading.

As to the particular measures of the Restructuring Plan, I agree with the government and the IRO that they are not inconsistent with, nor do they violate, any of the specific substantive provisions of the Consent Decree.[11]

It follows that the proposed intervenors fail to make a showing of entitlement to intervene in this action, either as of right or permissively. Their motions to intervene are accordingly denied.[12]

The related motion of the Macagnone Petitioners for class certification necessarily fails as well, and is denied.

The stay of implementation of the Restructuring Plan entered at the conclusion of the June 16, 1997 hearing is vacated.

It is SO ORDERED.

local unions and the elimination of right to elect business representatives violated UBC constitution); *Local No. 48 v. United Brotherhood of Carpenters and Joiners of America*, 920 F.2d 1047 (1st Cir.1990) (rejecting Local's claim brought pursuant to the LMRA and the LMRDA that merger of local unions violated the UBC constitution and federal labor law); *Millwright Local # 1079 v. United Brotherhood of Carpenters and Joiners of America*, 878 F.2d 960 (6th Cir.), *cert. denied*, 493 U.S. 965, 110 S.Ct. 407, 107 L.Ed.2d 373 (1989) (same).

11. In particular, the Court notes that the Restructuring Plan preserves district-wide rank-and-file elections for all District Council officers and the other members of the District Council Executive Board. Had the Plan not provided for such elections, it would have violated the Consent Decree. By way of contrast, there is nothing in the Consent Decree which requires election of business representatives. Moreover, the Restructuring Plan does not violate the proposed rules for future elections submitted by the IRO.

12. Nothing in this opinion is intended to intimate this Court's opinion on any of the issues that might arise if District Council local unions or their members brought a plenary action against the UBC under Federal labor law. This opinion could not intimate such views, since as stated in text, this action does not concern such issues.