**UPPER CHATTAHOOCHEE RIVERKEEPER FUND, INC., et al., Plaintiffs,**

v.

**The CITY OF ATLANTA, Defendant.**

**The United States of America and The State of Georgia, Plaintiffs,**

v.

**The City of Atlanta, Defendant.**

Civil Action Nos. 1:95–CV–2550–TWT, 1:98–CV–1956–TWT.

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 7, 2004.

 

David H. Pope, Carr, Tabb, Pope & Freeman, Atlanta, GA, for Plaintiffs.

Linda Katherine DiSantis, Office of Atlanta City Attorney, Law Department, Atlanta, GA.

Susan Barker Forsling, Office of Fulton County Attorney, Atlanta, GA, Richard Allen Horder, Kilpatrick Stockton, Atlanta, GA, for City of Atlanta.

John E. Hennelly, Office of State Attorney General, Atlanta, GA, William A. Weinischke, U.S. Department of Justice, Washington, DC, for United States.

J. Bertram Levy, Weinstock & Scavo, Atlanta, GA, for Fulton County Taxpayers Association, Inc.

*ORDER*

THRASH, District Judge.

These are consolidated actions against the City of Atlanta regarding the City's waste water collection and treatment system. The actions are brought pursuant to section 309 of the Clean Water Act, 33 U.S.C. § 1319, and the Georgia Water Quality Control Act, O.C.G.A. § 12–5–20 *et seq.* They are before the Court on the Fulton County Taxpayers Association, Inc.'s Motion to Intervene [1:95–CV–2550–TWT Doc. 177] [1:98–CV–1956–TWT Doc. 70]. For the reasons set forth below, the Motion to Intervene is DENIED.

## I. BACKGROUND

The Plaintiffs in these consolidated actions filed suit against the City of Atlanta, alleging violations of the Clean Water Act and the Georgia Water Quality Control Act. The Plaintiffs contend that the City is illegally discharging pollutants and violating the conditions set forth in the National Pollutant Discharge Elimination System Permits issued to it by the Georgia Department of Natural Resources' Environmental Protection Division ("EPD"). In the *Upper Chattahoochee Riverkeeper* case, the Court granted the citizen Plaintiffs' Motion for Summary Judgment as to liability on their Clean Water Act claims. On September 24, 1998, after lengthy and arms-length negotiations, the Court signed a Consent Decree setting forth the remedial measures to be taken by the City in order to eliminate the continuing violations of the Clean Water Act by the City's operation of a combined sewer overflow ("CSO") system. On December 20, 1999, after further negotiations, the Court signed a First Amended Consent Decree regarding remedial measures to be taken by the City to eliminate water quality violations from sanitary sewer overflows. In order to achieve compliance with the Consent Decrees and applicable federal and state regulatory and contractual requirements, the City developed the Capital Improvement Program, a comprehensive program consisting of 141 sewer and water system improvement projects. (Hunter Decl. ¶ 3.)

At present, the total cost of funding the Capital Improvement Program is approximately $3.48 billion.[1] (Hunter Decl. ¶ 17.) In order to fund the system improvements, the City issued water and sewer revenue bonds between 1999 and 2001. The City recently received authorization to issue additional water and sewer revenue bonds. (*Id.* ¶ 7.) The total bond proceeds plus the money received from other available funding sources will allow the City to provide funding in whole or in part for 80% of the Capital Improvement Program. (*Id.* ¶ 8.) In order to fund the Capital Improvement Program, the City passed an ordinance in January 2004, that will increase the water and sewer fees assessed to each City ratepayer over the next five years. (Fulton County Taxpayers Association, Inc.'s Motion to Intervene, Ex. C.) Additionally, in July 2004, the City residents approved the imposition of an additional one cent sales tax to pay for capital improvements to the sewer and water systems. (Hunter Decl. ¶ 16.)

The Fulton County Taxpayers Association, Inc. ("Taxpayers Association") is a nonprofit organization that represents taxpayers residing in Fulton County, Georgia. A substantial number of its members reside within the City of Atlanta and are subject to the City's water and sewer rates. (Sherman Aff. ¶¶ 2–5.) The Taxpayers Association alleges that its ratepayers will be forced to pay higher than necessary rates because the City has grossly abused its discretion and mismanaged the water and sewer programs. It further contends that the City violated state law during the adoption of its improvement plans. As a result of these alleged violations, the Taxpayers Association moves to intervene in this litigation in order to protect the financial interests of its member ratepayers.

If intervention is permitted, the Taxpayers Association will seek a declaration from the Court that the City abused its discretion. (Fulton County Taxpayers Association, Inc.'s Motion to Intervene, Ex. A, ¶ 50.) In addition, the Taxpayers Association will ask the Court to grant the following temporary and permanent injunctive relief: (1) enjoin the City from collecting the increased portion of the water and sewer fees or, alternatively, from further contracting out projects under the Capital Improvement Program; and (2) mandate that the City implement an independent oversight committee to review all projects not yet contracted. (*Id.* ¶ 52.) The City of Atlanta, the United States of America, the State of Georgia, and the Upper Chattahoochee Riverkeeper oppose the Motion to Intervene.

## II. *DISCUSSION*

The Taxpayers Association asserts that it is entitled to intervention as a matter of right pursuant to Rule 24(a) of the Federal Rules of Civil Procedure or, in the alternative, permissive intervention under Rule 24(b). Intervention as a matter of right is permitted in the following circumstances:

> Upon timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a). Permissive intervention is permitted in these circumstances:

> Upon timely application anyone may be permitted to intervene in an action ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed.R.Civ.P. 24(b). For the reasons set forth below, the Taxpayers Association is not entitled to intervene under Rule 24(a) or (b).

---

1. The Taxpayers Association states that the Capital Improvement Program will cost $3.73 billion. However, the City points out that the cost of the program has been reduced by more than $250 million since December 2003, resulting in a current revised total cost of $3.48 billion. (Hunter Decl. ¶ 17.)

## A. Intervention as a Matter of Right

 Rule 24(a) permits intervention as a matter of right if the applicant: (1) files a timely application; (2) asserts an interest relating to the property or transaction which is the subject of the action; (3) is so situated that disposition of the action may, as a practical matter, impair or impede its ability to protect the interest; and (4) has an interest that is not adequately represented by the existing parties to the suit. *Stone v. First Union Corp.*, 371 F.3d 1305, 1308–09 (11th Cir.2004). If the applicant establishes all of the prerequisites to intervention, a district court has no discretion to deny intervention. *Purcell v. BankAtlantic Financial Corp.*, 85 F.3d 1508, 1512 (11th Cir.1996). However, the failure to meet any of the requirements precludes intervention as of right. *See Howse v. S/V Canada Goose I*, 641 F.2d 317, 320 (5th Cir.1981).[2]

 In applying Rule 24(a), the Court must balance two competing interests: "efficiently administrating legal disputes by resolving all related issues in one lawsuit, on the one hand, and keeping a single lawsuit from becoming unnecessarily complex, unwieldy or prolonged, on the other hand." *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 69 (2nd Cir.1994). In order to protect these interests, a motion to intervene must be timely. *Purcell*, 85 F.3d at 1512. The motion in this case is not.

 This action was initially filed by the citizen Plaintiffs against the City in 1995. The Court granted summary judgment in favor of the citizen Plaintiffs on their claim that the City's CSO system violated the Clean Water Act. The United States of America and the State of Georgia filed suit in 1998. After lengthy negotiations, proposed consent decrees resolving the claims were published for public comment. After consideration of the public comments, the Court approved the Consent Decrees in 1998 and 1999. In June 2002, the City created an independent review commission to review the CSO Consent Decree component of the Capital Improvement Program. Hundreds of millions of dollars have been spent or committed to the Clean Water Atlanta Capital Improvement Program.

 In order to intervene of right, the application must be timely. The timeliness analysis concerns not only the chronology leading up to the motion for intervention, but also "all the circumstances," including: (1) the length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely. *Meek v. Metropolitan Dade County, Fla.*, 985 F.2d 1471, 1478–79 (11th Cir.1993). All of these factors weigh in favor of denying the Motion to Intervene.

First, it has been known generally since 1997, when the Court granted summary judgment in favor of the citizen Plaintiffs, that the City of Atlanta would be required to spend hundreds of millions of dollars to fix its old and neglected sewer system. In the intervening years, nothing has happened to diminish the cost of fixing the sewers. At the August 23, 2002, public meeting of the Mayor's Clean Water Advisory Panel, there was testimony that the Capital Improvement Program would cost $3.6 billion and require enormous increases in water and sewage rates if no other sources of revenue were available. The Taxpayers Association should have known that compliance with the Consent Decrees would have a significant financial impact upon its members. If the Taxpayers Association wanted to intervene, it should have done so much earlier. Consider-

2. In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

ation of this factor weighs against allowing intervention.

Second, the potential prejudice to the existing parties is enormous. The stated mission of the Taxpayers Association in this action is to delay the award of additional contracts and prohibit the collection of increased water and sewer fees. This would seriously disrupt the City's efforts to comply with the Consent Decrees, and expose the public to a degraded environment for who knows how much longer. The .Court has already threatened the City with a water and sewer hookup moratorium, contempt of court, and even receivership if the City does not comply with the Consent Decrees. (November 25, 2003 Hearing Transcript, at 23–24.) Granting any of the relief requested by the Taxpayers Association would cause enormous harm to the existing parties and the public at large. This factor weighs heavily against allowing intervention if there was any possibility of granting the relief requested.

Third, the Taxpayers Association has not persuaded the Court that it will be prejudiced by denial of the motion. There is no basis in fact for the Taxpayers Association's claim that the City has "arbitrarily refused to consider plans that could collectively save ratepayers $1.79 billion during the next decade." (Fulton County Taxpayers Association, Inc.'s Motion to Intervene, ¶ 20.) This claim is derived from a Fulton County Public Works staff memorandum. The memorandum is based upon incomplete information, assumes that many projects can be cut back or delayed without subjecting the City to serious sanctions for violating the Consent Decrees, and provides no support for its conclusion that the City can save $1.79 billion. The City's Clean Water Atlanta Program Management Team responded to the memorandum with a lengthy and detailed analysis. It appears to the Court that the City's response to the Fulton County Public Works staff memorandum has blown it to pieces; it is completely discredited as the basis for making any policy decisions. The Taxpayers Association's claim that the City is spending almost $2 billion more than it needs to is based upon nothing more than speculation and the sort of wishful thinking that got the City in the mess it was in when the current administration took office. (November 25, 2003 Hearing Transcript, at 7–8.) By contrast, the Wiedeman Engineering Report is a serious and fact-based analysis. It suggests that there may have been some over-budgeting of some projects. But, it does not support the sort of drastic disruption of the City's Capital Improvement Program which the Taxpayers Association is requesting.

Fourth, there are special circumstances which weigh heavily against allowing intervention at this stage of the litigation. The City's Capital Improvement Program is largely the City's plan for achieving compliance with the Consent Decree and First Amended Consent Decree. These Orders were the product of long and involved negotiations. The financial burden of fixing the sewers was a central consideration of the negotiations. The engineers for the governmental Plaintiffs and the engineers for the City looked at what needed to be done and agreed to a schedule that would not create financial impossibilities. (November 25, 2003 Hearing Transcript, at 19.) Granting the relief requested by the Taxpayers Association would upset the delicate balance achieved by the negotiations of getting the sewers fixed as soon as possible and not crushing the City financially. The Taxpayers Association wants to go back and renegotiate the deal. Allowing that in this case would set a terrible precedent, and is not in the public interest. The Motion to Intervene should be denied as untimely.

■■■ In addition, the Taxpayers Association does not have a legally protectable interest in the litigation sufficient to justify intervention. Intervention may not be used as a means of injecting collateral issues into an existing action. *United States v. City of New York*, 198 F.3d 360, 365 (2nd Cir.1999). The threshold determination to be made is whether an applicant can establish a protectable interest in the subject of the action. *See Portland Audubon Soc. v. Hodel*, 866 F.2d 302, 308 (9th Cir.1989); *Piedmont Heights Civic Club, Inc. v. Moreland*, 83 F.R.D. 153 (N.D.Ga.1979). To justify intervention, the applicant must be a real party in interest and assert a "direct, substantial, legally protecta-

ble interest in the proceedings." *Purcell*, 85 F.3d at 1512. The Taxpayers Association has failed to establish an interest in the subject matter of this litigation sufficient to justify intervention as a matter of right.

This is an action to enforce compliance with the Clean Water Act. The Taxpayers Association does not seek any relief under the Clean Water Act or its Georgia equivalent. The Taxpayers Association alleges that the City has "grossly overbudgeted the Capital Improvement Program, ignored potential conflicts of interest held by its officials, refused to professionally certify many of its reports used to budget its projects, and refused to provide adequate disclosures under the Open Records Act." (Fulton County Taxpayers Association, Inc.'s Motion to Intervene, ¶ 20.) Therefore, the Taxpayers Association asserts that its members have "an interest in ensuring that the consent decree projects are managed in compliance with state law, and do not expose its ratepayers to grossly inflated fees, taxes, or future liability." (Fulton County Taxpayers Association, Inc.'s Reply at 26.) In essence, the Taxpayers Association's interest involves the financial impact of the Capital Improvement Program on its ratepayers. That interest, however, is not sufficiently related to the matters before the Court.

█ An applicant's interest need not be of a legal nature identical to the claims asserted in the main action. But, the interest must be directly, not tangentially, related to the underlying subject matter. *Georgia v. United States Army Corps of Engineers*, 302 F.3d 1242, 1251 (11th Cir.2002); *see also United States v. Alisal Water Corp.*, 370 F.3d 915, 919–20 (9th Cir.2004); *United States v. Metropolitan Dist. Comm'n*, 147 F.R.D. 1, 4 (D.Mass.1993). Although the Taxpayers Association's members will be economically affected by the projects necessitated by the Consent Decrees, their interests are only peripherally related to the subject matter of this litigation.

A similar factual scenario was addressed in *United States v. City of New York*, 179 F.R.D. 373 (E.D.N.Y.1998), *aff'd*, 198 F.3d 360 (2nd Cir.1999). In that case, the United States of America brought an action to com-

pel the City of New York to comply with the Safe Drinking Water Act. The Act required a filtration system for all public water systems using surface water. A group consisting of individual water ratepayers and New York City taxpayers sought to intervene in order to prevent the development of a particular filtration system. The group asserted the financial interest of its ratepayers who would be forced to pay higher rates to finance the filtration project. *Id.* at 376. The district court determined that the group lacked an interest in the subject matter of the action because the cost associated with filtration was not an issue to be determined in the litigation. *Id.* at 379–80. The Second Circuit Court of Appeals affirmed the district court's denial of intervention. *City of New York*, 198 F.3d at 365. The court noted that, at an abstract level, the government's action and the group's interests both involved filtration. However, the group's concerns about the cost of filtration were irrelevant to the compliance action and, therefore, did not establish a direct interest in the subject matter of the litigation. *Id.*

Similarly, the focus of this litigation has been to ensure that the City's water and sewer systems comply with the Clean Water Act and the Georgia Water Quality Control Act. The Taxpayers Association asserts the economic interest of its ratepayers who will have to pay higher rates to finance the improvements to these systems. The Taxpayers Association and its members do not have any interest under state or federal law that allows them to prevent the City from spending what it thinks is necessary to comply with the law, to comply with the Orders of this Court and the State of Georgia, and to provide its citizens with clean water and a clean environment. *See City of New York*, 198 F.3d at 365; *see also Alisal Water Corp.*, 370 F.3d at 920 (applicant's economic interest in the collectability of debt during the remedial phases of litigation was "several degrees removed from the overriding public health and environmental policies that [were] the backbone of this litigation").

█ Without an interest directly related to the environmental subject matter of the litigation, the Taxpayers Association is

left to argue that it has a direct, substantial, and legally protectable interest based on the Court's continuing jurisdiction over the remedial phase of the litigation. Once a consent decree is entered, the court's role is to ensure that the parties comply with the terms of the decree. *See United States v. District Council of New York City and Vicinity of the United Broth. of Carpenters and Joiners of America,* 972 F.Supp. 756, 763 (S.D.N.Y.1997) ("[T]he Court is concerned only with the proper implementation of the Consent Decree."). There is a strong public policy against judicial rewriting of consent decrees. *Reynolds v. Roberts,* 202 F.3d 1303, 1312 (11th Cir.2000). Therefore, the court should not expand its involvement into matters only marginally related to the terms of the consent decree. *See District Council of New York City,* 972 F.Supp. at 763 (intervenors not permitted to object to plan implemented under consent decree because court's jurisdiction was limited to implementation of consent decree, not all matters concerning conduct of parties). In essence, the Taxpayers Association is complaining that the City is trying too hard to comply with the Consent Decrees, and that it should take longer and spend less. That is not a legal basis for seeking any relief in this action.

The scope of the Court's continuing jurisdiction in the remedial phase of this litigation is set forth in each Consent Decree as follows: "The Court shall retain jurisdiction to enforce the terms and conditions and achieve the objectives of this [First Amended] Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction, modification, implementation or execution of this [First Amended] Consent Decree." (Consent Decree at 108; First Amended Consent Decree at 130.) Here, the objective of each Consent Decree is to achieve compliance with the Clean Water Act and to resolve deficiencies in the City's water and sewer systems. In order to do so, the Consent Decrees identify improvements necessary to comply with environmental and health standards and set forth schedules for implementing those improvements. Thus, the scope of the Court's jurisdiction is limited to ensuring compliance with the environmental standards and the schedules associated with the improvements. The Consent Decrees do not give the Court plenary jurisdiction over all matters that may arise out of the City's water and sewer Capital Improvement Program. *See Davis v. Butts,* 290 F.3d 1297, 1300 (11th Cir.2002) (intervention denied because interest in non-race-related violations of consent decree had little to do with the racial discrimination that was the basis of the litigation). The City's decisionmaking process and the ultimate cost of the programs implemented to comply with the Consent Decrees are outside the scope of the decrees and the Court's enforcement jurisdiction. Because the Taxpayers Association has failed to assert an interest relating to the subject of the litigation, its Motion to Intervene must be denied.

## B. *Permissive Intervention*

 The Taxpayers Association, in the alternative, seeks permissive intervention under Rule 24(b). Courts have discretion to allow permissive intervention if: (1) there is a common question of law or fact between the applicant's claim or defense and the main action, and (2) intervention will not inject new issues into the main action or cause undue delay in resolving the main action. Fed.R.Civ.P. 24(b); *ManaSota–88, Inc. v. Tidwell,* 896 F.2d 1318, 1323 (11th Cir.1990). For the reasons stated above, the motion is not timely. Furthermore, the Taxpayers Association cannot show any common question of law or fact between its claims and those asserted in the underlying litigation. As discussed above, this case has dealt exclusively with the City's compliance with federal and state environmental and public health standards. The Taxpayers Association's main complaint is mismanagement of City government. Therefore, allowing intervention would inject entirely new issues into the main action. *See Piedmont Heights Civic Club,* 83 F.R.D. at 158. Intervention is not in the public interest. Courts should avoid permitting intervention that could delay compliance with environmental standards. *ManaSota–88,* 896 F.2d at 1323 ("[A]n action which seeks to preserve the environment from further deterioration deserves refuge from the undue delay that would result from appellant's intervention."); *see also United*

*States v. South Florida Water Management Dist.,* 922 F.2d 704, 711–12 (11th Cir.1991). Here, the objective of the Consent Decrees is to hasten the City's compliance with the Clean Water Act and the Georgia Water Quality Control Act. Permitting the Taxpayers Association to attack the economics of the City's compliance and enjoin the City from entering into further contracts could cause undue delay in meeting the specified deadlines and fulfilling the environmental objectives of this action. Thus, the Taxpayers Association's request for permissive intervention is also denied.

### III. CONCLUSION

For the reasons set forth above, the Fulton County Taxpayers Association, Inc.'s Motion to Intervene [1:95–CV–2550–TWT Doc. 177] [1:98–CV–1956–TWT Doc. 70] is DENIED.